UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA

-vs-                                                                                             Case No.:  2:06-cr-4-FtM-33SPC

JIMMY LOUISUIS
_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

This matter comes before the Court on the Defendant Jimmy Louisuis' Motion to Suppress Evidence (Doc. # 57) filed on April 27, 2006.  On May 23, 2006, a hearing was held on the Motion before the Honorable Sheri Polster Chappell, United States Magistrate Judge.  At that hearing, the Government called Collier County Sheriff's Office Investigator Patty Rodriquez, Deputy Timothy Dunford, Deputy U.S. Marshal Paul Smith, and Sergeant Anthony Pascucci.  The Defendant did not present any evidence at the hearing.

After the hearing, the Government filed a Supplemental Memorandum (Doc. # 68) on the issue of standing.  The Court directed the Defendant to respond to the Supplemental Memorandum by June 7, 2006.  The Defendant requested a brief extension of time to reply.  The Court granted the Motion and enlarged the time for the Defendant to respond to June 15, 2006.  The Defendant filed his response (Doc. # 80) on June 15, 2006.

## TESTIMONY AND EVIDENCE

**Investigator Patty Rodriquez**: (Tr. 3-35).

Inv. Rodriquez has served with the Collier County Sheriff's Office (CCSO) for approximately twenty (20) years. (Tr. 4:3-10).  She currently serves as an undercover investigator with the CCSO's

Vice and Narcotics Unit. Inv. Rodriguez testified to the events that lead to her investigation of Louisuis Co-Defendant Elex Pierre.

Inv. Rodriquez made an undercover buy of $100.00 worth of crack cocaine from Elex Pierre on June 16, 2005, outside of Pierre's residence located at 5210 Hemingway Circle, Apt. # 2304. (Tr. 5:4-24). She made another undercover $100.00 purchase on June 30, 2005, from inside Pierre's Hemingway Circle residence. (Tr. 6:6-10). Based upon Inv. Rodriguez's surveillance and her two (2) undercover purchases of crack cocaine from Pierre, a search warrant was obtained at a later date to search the Hemingway Circle apartment. (Tr. 6:15-24).

The search warrant was served at the Hemingway residence on July 29, 2005. During the search, officers seized a large amount of crack cocaine, marijuana, one bullet proof vest, two assault rifles, three handguns, ammunition, and approximately $6000.00 in U.S. currency. (Tr. 7:1-25, 8:1-16). Officers also arrested Joe Johnson, a juvenile, Exuis Louis, and Youwus Vilpre. (Tr.9:3-6). Elex Pierre was not present during the search of the Hemingway residence. (Tr. 9:7-11). Subsequent to the search, two warrants were issued for the arrest of Elex Pierre. (Tr. 9:12-25). The first for possession of cocaine and possession with intent to sell based upon Pierre's sale of cocaine to Inv. Rodriguez, and the second for trafficking based upon the evidence seized at the Hemingway residence. (Tr. 10:3-8).

During March of 2005, Inv. Rodriguez conducted surveillance at the residence located at 2615 Andrews Drive in Naples, Florida. (Tr.11:3-13). Inv. Rodriguez stated that the CCSO had information that individuals at the Andrews Drive residence were traveling to and from Miami purchasing one to two kilos of cocaine to distribute in the Naples, Florida area. (Tr. 10:16-25, 11:1-2). During her surveillance, she observed Elex Pierre at the Andrews Drive residence fifteen (15) to

twenty (20) times. (Tr. 11:3-13). The Defendant in this case, Jimmy Louisuis, accompanied him on most of the occasions he was observed at the Andrews Dr. residence. (Tr. 12:1-2). Inv. Rodriguez testified that she was able to identify the individual that accompanied Pierre as the Defendant by tracing the tags on the vehicles parked at the Andrews residence. (Tr.11:21-25).

A trace was also run the tag of a white Chevrolet seen at the Andrews residence. The trace on the white Chevrolet's tag was registered to an address at 850 Date Court in Immokallee, Florida. (Tr. 12:3-7). The Immokallee address was the residence of Elex Pierre's mother. (Tr. 12:8-10). The CCSO's Warrants Bureau as well as Inv. Rodriguez made two trips to the Immokallee address and other Vice and Narcotics officers made between five (5) and ten (10) trips to Immokallee in an attempt to arrest Pierre. (Tr. 13:13-25, 14:1-7). Pierre was never observed at that address. (Tr. 13:8-13).

Inv. Rodriguez testified that prior to August 30, 2005, she did not know where Pierre lived, however, she thought he might have been living at the Andrews Dr. Residence. (Tr. 14:24-25, 15:1-3). Since she had Pierre's cell phone number from her previous undercover drug buys, on August 30, 2005, Inv. Rodriguez called Pierre's cell phone to arrange a crack cocaine buy in an attempt to discover where he was staying. (Tr. 15:4-15). Pierre told her he was in East Naples. (Tr. 15:16-20). Andrews Drive is in East Naples. (Tr. 15:21-24). Based on her phone conversation with Pierre, Inv. Rodriguez conducted surveillance on the Andrews residence on August 30 and 31, 2005. (Tr. 15:25, 16:1-4).

On August 31, 2005, Inv. Rodriguez began her surveillance of the Andrews residence around 8:00 a.m. (Tr. 16:14-18). Inv. Rodriguez described the area around the Andrews residence as a low income area, where many people don't work, with lots of small single family dwellings situated in

very close proximity to one another. (Tr. 16:19-25, 17:1-8). An elementary school is located on the corner approximately 1000 feet away. (Tr. 17:2-3). Inv. Rodriguez testified that there was a lot of vehicle traffic in the area but no pedestrian traffic at that time although she had observed some earlier in the morning. (Tr. 29:15-21).

Inv. Rodriguez phoned Pierre on his cell phone to confirm a proposed drug transaction. (Tr. 18:15-22). From her surveillance point, Inv. Rodriguez saw Pierre answer the phone. (Tr. 18:20-25). He remained outside of the residence for approximately fifteen (15) to twenty (20) minutes. (Tr. 18:20-25, 19:1). After she hung up with him, Pierre reentered the residence. Inv. Rodriguez stated that she believed Pierre was living at the Andrews residence. (Tr. 19:18-22). The U.S. Marshals, then assisted officers from the CCSO's Warrants Bureau and Vice and Narcotics unit on entering the Andrews Drive residence and arresting Pierre. (Tr. 21:10-21).

**Corporal Timothy Danford**: (Tr. 35-41).

Cpl. Danford has served with the CCSO since November of 1987. (Tr. 36:1). In 1993, Cpl. Danford was assigned to the CCSO's Fugitive Warrants Bureau. He took a couple of years off and returned to the Fugitive Warrants Bureau in 2000 and has remained there ever since. (Tr. 36 5:4-7). Based upon an arrest warrant issued on either August 4 or 5, 2005, Cpl. Danford attempted to locate and arrest Elex Pierre at a residence at 850 Date Court, in Immokalee, Florida . (Tr. 36:12-17). Cpl. Danford traveled to the Immokalee address on several occasions, spoke to Pierre's mother and sister, and searched the house, however, he never located Pierre at that address. (Tr.37:2-22).

Cpl. Danford testified that informants on the streets in Immokalee provided information that Pierre was armed with a .45 caliber pistol and was considered armed and dangerous. (Tr. 37:11-18).

However, Cpl. Danford did not find any weapons when he searched the Immokalee residence. (Tr.40:8-10).

**Deputy U.S. Marshal Paul Smith**: (Tr. 41-54).

Dep. Marshal Smith has served with the United States Marshals Service for fourteen (14) years. (Tr. 42:1-2). He currently serves on the fugitive warrants squad. (Tr. 42:4-6).

As a member of the fugitive warrants task force, he was requested to assist in the location and apprehension of Elex Pierre. (Tr. 42:5-15). Dep. Marshal Smith testified that he had been supplied with Pierre's phone number by the CCSO. (Tr.42:18-21). He obtained a warrant to track the number via cell cite information. (Tr. 42:22-25, 43:1-6).

On the afternoon of August 30, 2005, Dep. Marshal Smith used cell cite information to track Pierre's cell phone. (Tr. 43:14-20). The cell cite tracked Pierre's cell phone to within a mile of the Andrews Drive residence. (Tr. 44:1-10). The phone remained in that area until Dep. Marshal Smith stopped his surveillance around eight or nine o'clock that evening. (Tr. 44:11-20). The next day, Dep. Marshal Smith was able to obtain a GPS lock on the cell phone. (Tr. 44:21-25). The GPS lock showed that Pierre's cell phone was located within forty (40) meters of 2615 Andrews Drive, Naples, Florida. (Tr. 45:8-11).

Dep. Marshal Smith departed Fort Myers, Florida for Naples where he met with Sergeant Tony Pascucci at 8:45 a.m. (Tr. 45:14-19). Dep Marshal Smith and Sgt. Pascucci met in a parking lot away from the Andrews residence in order to reduce the police presence that was building up in the neighborhood. (Tr. 46:2-5). Dep. Marshal Smith learned that Inv. Rodriguez had called Pierre on his cell phone and had him under surveillance at the Andrews Drive residence. (Tr.46:19-25).

Dep. Marshal Smith then determined that he would approach the Andrews Drive residence

and knocked on the door to see if Pierre would answer. (Tr. 47:11-13). Dep. Marshal Smith knocked on the door and announced who he was and pursuant to departmental policy, and waited thirty (30) to forty-five (45) seconds for a response. (Tr. 47:20-21). The purpose for waiting the thirty (30) to forty-five (45) seconds was to allow Pierre time to open the door but also limit the amount of time Pierre had to gather himself, obtain a firearm, and/or put on a bullet proof vest. (Tr 50:15-22). When no response was forthcoming, Dep. Smith initiated a forcible entry. (Tr. 47:22-23). Inside the Andrews Drive residence, Dep. Marshal Smith found Pierre and the Defendant hiding in a back bedroom. (Tr. 48:4-8). A gun was found underneath the bed they were on. (Tr. 48:6-8).

Dep. Marshal Smith testified that while he did think about getting a warrant to enter the residence in pursuit of Pierre, he did not discuss it with anyone. (Tr. 49:19-25). Dep. Marshal Smith testified that based on the information gather from the search of Pierre's Hemingway residence, that Pierre was dangerous and that taking the time to get a search warrant would give Pierre time to discover the officers presence and arm himself. (Tr. 50:9-22).

**Sergeant Anthony Pascucci**: (Tr. 55-64).

Sgt. Pascucci has served with the CCSO for the past fourteen (14) years. (Tr. 56:3-5). He currently serves with the CCSO's Organized Crime Division. (Tr. 55:18). He testified to the events that led up the search of the residence at Andrews Drive and the arrest of Pierre and the Defendant.

Sgt. Pascucci investigated Pierre from June through August of 2005. (Tr. 56:6-13). Elex Pierre was documented as a gang member in the Zoe Pound street gang. (Tr. 56:16-17). He was a suspect in a murder investigation in Broward County. (Tr. 57:5-13). The Broward County victim's cell phone was found in Pierre's Hemingway apartment when it was searched on July 31, 2005. (Tr.

18-25, 58:1-2). Sgt. Pascucci testified that the murder victim from Broward had provided or was about to provide information to the authorities regarding Pierre. (Tr. 58:12-19).

Sgt. Pascucci was assisting the U.S. Marshal's in their investigation of the Andrews Drive residence. (Tr. 58:20-25). Sgt. Pascucci testified he had a reasonable belief that Pierre was staying at the Andrews Drive residence. (Tr.59:10-19). His conclusion was based upon attempts to locate Pierre at the Hemingway residence, the Immokalee residence, and surveillance reports that Pierre frequented the Andrews Drive residence often. (Tr. 59:10-19).

Sgt. Pascucci further testified that exigent circumstances existed that required the Marshals to invade the Andrews residence without a search warrant. (Tr. 59:1-9). Based upon the information he had regarding Pierre, Sgt. Pascucci believed that Pierre was armed and dangerous. Regarding the exigent circumstances surrounding the arrest of Pierre at the Andrews Drive residence, Sgt Pascucci testified as follows:

> [w]ell based upon him being a suspect in a homicide and him evading law enforcement because of his knowledge of a warrant being out for his arrest and his history that – and the area in which the home was that he was staying at, with the school right down the street and the busy highway on the other end of the street, and not wanting to trying to take him in public, we felt that it was important and necessary to take him down in the house.

(Tr. 60:5-12). Sgt. Pascucci also testified that the firearms, ammunition and a ballistics vest found at his Hemingway address, as well as nature of some of Pierre's associates, created in his mind a belief that sufficient exigent circumstances existed to enter the Andrews Drive residence without a warrant. (Tr. 60:1-20).

Sgt. Pascucci testified it was his belief that under state law he did not need a search warrant to enter the house to arrest Pierre. (Tr. 61:19-25). It was his impression that Pierre was living in the Andrews residence. (Tr. 62:7-14). In accord with CCSO policy, Sgt. Pascucci and the entry team

knocked and announced. (Tr. 63:5-13). Sgt. Pascucci was the officer that actually arrested Pierre. (Tr. 63:21-23).

## DISCUSSION

"The Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects." Illinois v. Rodriquez, 497 U.S 177, 181, 110 S. Ct. 2793, (1990). The issue before the Court is a narrow one. The Andrews Drive residence was owned by a third party other than Elex Pierre or the Defendant Jimmy Louisuis. Officers from the U.S. Marshal's service and the CCSO entered the Andrews Drive residence pursuant to two arrest warrants in search of Elex Pierre. Upon entry, they found Pierre and the Defendant Louisuis in a back bedroom. Thus, the narrow issue before the Court is whether Louisuis' Fourth Amendment right to privacy was violated when officers entered the Andrews Drive residence pursuant to the arrest warrants for Elex Pierre.

The Defendant argues that his Fourth Amendment right was violated because the officers entered the Andrews Drive residence without a search warrant. The Government argues that sufficient exigent circumstances existed to overcome the need for a search warrant. Additionally, the Government argues that the Defendant does not have standing to assert a privacy interest in the Andrews Drive residence.

### *(A) Whether the Defendant Louisuis has Standing*

The Fourth Amendment protects persons against unreasonable searches of their persons and houses and thus, the Fourth Amendment is a personal right that must be invoked by an individual. Minnesota v Carter, 525 U.S. 83, 88, 119 S. Ct. 469, 142 L. Ed. 2d 373 (1998); Katz v. United States, 389 U.S. 347, 351, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967) (holding the Fourth Amendment

protects people not places). The extent to which the Fourth Amendment protects people depends upon "where those people are." Carter, 525 U.S. at 88. The capacity to claim Fourth Amendment protections depends upon "whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." Id. A person has a legitimate expectation of privacy protected by the Fourth Amendment if he has a subjective expectation of privacy, and if society is prepared to recognize that expectation as objectively reasonable. Katz, 389 U.S. at 361.

In its closing argument, the Government asserted that the Defendant lacked standing to claim Fourth Amendment protection because he did not present a factual basis stating he lived in the Andrews drive residence. The Court accepted the Government's supplemental brief on the issue and directed the Defendant to respond. On June 15, 2006, the Defendant filed a responsive brief. In that Brief, the Defendant stated that he had occupied the Andrews residence as a tenant prior to March of 2006, and further that Louisuis personal effects and photos of his family were located in the Andrews Drive residence. (Defendants Response, Doc. # 80 at 9). Clearly a person living as a tenant in a residence has a reasonable expectation to privacy in his own home. *See* Minnesota v Olsen, 495 U.S. 91, 110 S. Ct. 1684, 109 L. Ed. 2d 85 (1990) (holding that even overnight guests in someone else's home has an expectation of privacy protected by the Fourth Amendment)). Therefore, the Court concludes that the Defendant has standing to bring the Motion to Suppress.

*(B) Whether Exigent Circumstances Existed to Overcome the Need for a Search Warrant*

A warrantless search is presumptively unreasonable. U.S. v. McGregor, 31 F.3d 1067, 1068 (11th Cir. 1994). In fact, Courts have held that absent exigent circumstances or consent, law enforcement officers may not legally search for a subject of an arrest warrant in the home of a third person, without first obtaining a search warrant. Steagald v. U.S., 451 U.S. 204, 216, 101 S. Ct.

1642, 68 L. Ed. 2d 38 (1981). However where probable cause exists and exigent circumstances make it impossible or impractical to obtain a warrant, the warrantless entry may be excused. Id.; U.S. v. Tobin, 923 F.2d 1506, 1510 (11th Cir. 1991) *cert. denied,* 502 U.S. 907, 112 S. Ct. 299, 116 L. Ed. 2d 243 (1991) (holding to justify a warrantless entry into a house there must exist exigent circumstances in addition to probable cause). However, exigent circumstances will not justify a warrantless entry if the exigency was created by those conducting the search. Tobin, 923 F.2d at 1510. For example, a warrantless search is not justified when police have probable cause and sufficient time to obtain a warrant but create an exigency to avoid the warrant requirement. Id.

In United States v. Standridge, the Eleventh Circuit listed several factors which would indicate the existence of exigent circumstances. 810 F.2d 1034, 1037 (11th Cir. 1987) *cert. denied*, 481 U.S. 1072, 107 S. Ct. 2468, 95 L. Ed. 2d 877 (1987). "Factors which indicate exigent circumstances include: (1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) a reasonable belief that the suspect is armed; (3) probable cause to believe that the suspect committed the crime; (4) strong reason to believe that the suspect is in the premises being entered; (5) a likelihood that delay could cause the escape of the suspect or the destruction of essential evidence, or jeopardize the safety of officers or the public. Standridge, 810 F.2d at 1037. Each factor will be addressed separately by the Court.

(1) *Whether the Gravity or Violent Nature of the Offense Justified warrantless Entry*

The test of whether exigent circumstances exist is an objective one. Tobin, 923 F.2d at 1510. In this instance, the test is whether or not a reasonable experienced agent would believe that the gravity of Pierre's offenses or the violent nature of his crimes created sufficient exigent circumstances to enter the Andrews Drive residence without a search warrant. *See* Id. (holding the appropriate

inquiry is whether a reasonable experienced officer would believe that evidence might be destroyed before a warrant could be obtained).

Officers entering the Andrews residence were aware that multiple firearms had been discovered at Pierre's Hemingway address. (Tr. 7:1-25, 8:1-16, 50:9-22). They also had knowledge that Pierre, in addition to his drug activities, was a member of a street gang known as the Zoe Pounders, and that he was a suspect in a murder investigation in Broward County. (Tr.57:5-16). The Broward County victim's cell phone was found in Pierre's Hemingway apartment when it was searched on July 31, 2005. (Tr.57:21-25, 58:1-2). Sgt. Pascucci testified that the murder victim from Broward had provided or was about to provide information to the authorities regarding Pierre. (Tr. 58:4-19).

Pierre, was also a heavily involved in dealing drugs. The Andrews Drive residence was known as a stash house for narcotics. (Tr. 19:21-25, 20:1-6). The Eleventh Circuit has stated that the "need to invoke the exigent circumstances exception is particularly compelling in narcotics cases because narcotics can be so quickly destroyed." Tobin, 923 F.2d at 1510 (citing U.S. v. Young, 909 F.2d 442, 446 (11th Cir. 1990) (internal quotes omitted)).

Thus, given the nature of Pierre's drug activity and the violent nature of other crimes he was suspected of being involved in, the first Stanbridge factor was satisfied.

### (2) Whether Officers had a Reasonable Belief that the Pierre was Armed

During the search of Pierre's Hemingway residence, officers seized, one bullet proof vest, two assault rifles, three handguns, and ammunition. (Tr. 8:8-16). Cpl. Danford testified that informants on the streets in Immokalee stated that Pierre was armed with a .45 caliber pistol and was considered armed and dangerous. (Tr. 37:8-22). Based upon Pierre's background and the information he had

regarding Pierre, Sgt. Pascucci testified that he believed Pierre was armed and dangerous. (Tr. 60:1-20). Given the circumstances surrounding the entry of the Andrews Drive residence, it was reasonable for the officers on the scene at the Andrews residence to believe that Pierre was armed.

*(3) Whether There was Probable Cause to Enter the Andrews Residence in Search of Elex Pierre*

Probable cause exists when under the "totality-of-the-circumstances . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v Gates, 462 U.S. 213,238, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983). In other words, probable cause exists where the facts lead a reasonably cautious person to believe that the search will uncover the sought after evidence or person. Tobin, 923 F.2d at 1510 (internal quotations omitted).

In this instance probable cause existed to believe that a wanted fugitive was inside the Andrews Drive residence. Subsequent to the search of Pierre's Hemingway residence, two warrants were issued for his the arrest. (Tr. 9:12-25). The first for possession of cocaine and possession with intent to sell based upon Pierre's sale of cocaine to Inv. Rodriguez, and the second for trafficking in narcotics based upon the evidence seized at the Hemingway residence. (Tr. 10:3-8). Pierre had evaded arrest since the issuance of the warrant. In the early morning hours, around 8:00 a.m of August 31, 2006, Pierre was seen at the Andrews Drive residence by Inv. Rodriguez who had the house under surveillance. (Tr. 16:14-18). She made a cell phone call to Pierre to confirm an undercover drug buy. While on the phone with Pierre, Inv. Rodriguez saw him outside the Andrews Drive residence and observed him return inside the residence when the call ended. (Tr. 18:15-25). In a matter of minutes after Inv. Rodriguez hung up with Pierre, the U.S. Marshal and CCSO deputies knocked on the door. (Tr. 28:2-6). Clearly, there was sufficient probable cause for a reasonable experienced officer to believe that a wanted fugitive was inside the Andrews Drive residence.

### *(4) Whether Elex Pierre was Located at the Andrews Residence*

On the morning of August 31, 2006, Inv. Rodriquez spoke with Pierre on his cell phone. (Tr. 18:10-16). From her surveillance position she saw Pierre outside the Andrews Drive residence answer his phone and after the conversation was complete, she watched him return inside the residence. (Tr. 18:15-25, 19:1-7). Officers made their entry into the residence within minutes of the call ending. (Tr. 28:2-6). Thus, based on Inv. Rodriguez surveillance, and her phone conversations with Pierre, it was plausible for the officers entering the Andrews Drive residence to assume that Pierre was inside the residence at the time of the incursion.

### *(5)   Whether There was the Likelihood that Delay Could Cause the Escape of Pierre or the Destruction of Essential Evidence, or Jeopardize the Safety of Officers or the Public*

The exigent circumstances exception to the Fourth Amendment warrant requirement applies in those cases where "the societal costs of obtaining a warrant, such as danger to law officers or the risk of loss or destruction of evidence, outweigh the reasons for prior recourse to a neutral magistrate." U.S. v. Blasco, 702 F.2d 1315, 1325 (11th Cir. 1983); U.S. v Santa, 236 F.3d 662, 669 (11th cir. 2000); Standridge, 810 F.2d at1037.

Sgt. Pascucci testified to circumstances that he believed created a sufficient exigency to bypass the need for a warrant. He noted that Pierre was a suspect in a homicide, he was evading law enforcement, he had a bad prior history, the neighborhood in which the residence was located was crowded with houses and known for crime and the officers were afraid that someone would alert Pierre of their presence, there was a school located down the street, there was a highway nearby, firearms were found at his Hemingway address, and other associates of Pierre were also involved in homicide. (Tr. 60:1-20). Sgt. Pascucci's testimony is supported by the testimony of Inv. Rodriguez.

Given the fact that Pierre had been on the run for over a month, was most likely armed, was a suspect in a murder investigation in Broward County, and was involved in narcotics trafficking, the Court finds that there were significant safety concerns for the neighbors, the school children, and officers at the scene to justify the officer's actions. There clearly existed a very real danger that Pierre might flee and escape as well as a danger of real harm to the police officers and/or the general public. Consequently, the Court finds that there was sufficient exigent circumstances present for the U.S. Marshals and deputies from the CCSO to enter the Andrews Drive residence without first securing a search warrant.

After the entry into the Andrews Drive residence, the Defendant Elex Pierre was arrested. The Defendant in this case, Jimmy Luisuis was also present in the residence at the time of Pierre's arrest. Based upon other evidence found at the scene during the arrest of Pierre, officers obtained a search warrant for the premises. (Tr. 48:1-3). A second firearm was found as well as some narcotics. (Tr.48:1-3). The Defendant moves to have all evidence obtained subsequent to the issuance of the warrant suppressed as the fruit of the poisonous tree. However, having determined that exigent circumstances existed to allow the warrantless entry of the Andrews Drive residence, the Court respectfully recommends that any evidence seized during the search of the Andrews Drive residence should not be suppressed.

Accordingly, it is now

**RECOMMENDED:**

The Defendant Jimmy Louisuis' Motion to Suppress Evidence (Doc. # 57) is **DENIED**.

Given the fact that Pierre had been on the run for over a month, was most likely armed, was a suspect in a murder investigation in Broward County, and was involved in narcotics trafficking, the Court finds that there were significant safety concerns for the neighbors, the school children, and officers at the scene to justify the officer's actions. There clearly existed a very real danger that Pierre might flee and escape as well as a danger of real harm to the police officers and/or the general public. Consequently, the Court finds that there was sufficient exigent circumstances present for the U.S. Marshals and deputies from the CCSO to enter the Andrews Drive residence without first securing a search warrant.

After the entry into the Andrews Drive residence, the Defendant Elex Pierre was arrested. The Defendant in this case, Jimmy Luisuis was also present in the residence at the time of Pierre's arrest. Based upon other evidence found at the scene during the arrest of Pierre, officers obtained a search warrant for the premises. (Tr. 48:1-3). A second firearm was found as well as some narcotics. (Tr.48:1-3). The Defendant moves to have all evidence obtained subsequent to the issuance of the warrant suppressed as the fruit of the poisonous tree. However, having determined that exigent circumstances existed to allow the warrantless entry of the Andrews Drive residence, the Court respectfully recommends that any evidence seized during the search of the Andrews Drive residence should not be suppressed.

Accordingly, it is now

**RECOMMENDED:**

The Defendant Jimmy Louisuis' Motion to Suppress Evidence (Doc. # 57) is **DENIED**.

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

**Respectfully recommended** at Fort Myers, Florida, this ___22nd___ day of June, 2006.

*/s/ Sheri Polster Chappell*
SHERI POLSTER CHAPPELL
UNITED STATES MAGISTRATE JUDGE

Copies: All Parties of Record